

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-2006

# Jenkins v. Comm Social Security

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2677

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Jenkins v. Comm Social Security" (2006). *2006 Decisions*. Paper 567.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/567

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Case No: 05-2677
_____

GAIL JENKINS,

Appellant

v.

COMMISSIONER OF SOCIAL SECURITY

_____

On Appeal from the United States District Court
for the District of New Jersey
(Civil Action No. 03-3508)
District Judge: Hon. William J. Martini

Submitted under Third Circuit LAR 34.1(a)
May 18, 2006

Before: SCIRICA, Chief Judge, McKEE and STAPLETON, Circuit Judges

(Opinion filed: August 18, 2006)

_____

OPINION

_____

McKEE, Circuit Judge.

Gail Jenkins appeals from the District Court's order affirming the decision of the

Commissioner of Social Security denying her application for Supplemental Security

Income ("SSI") under the Social Security Act. 42 U.S.C. § 423 *et seq.* The District Court

had jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(g), and we have jurisdiction

pursuant to 28 U.S.C. § 1291. For the reasons that follow, we will affirm.

## I.

Inasmuch as we write primarily for the parties who are familiar with this dispute,

we need not reiterate the factual or procedural background of this appeal. The ALJ's

decision is the final decision of the Commissioner when the Appeals Council denies a

request for review. *Hartranft v. Apfel*, 181 F.3d 358, 359. Our scope of review is limited

to determining if the Commissioner's final decision is supported by substantial evidence.

42 U.S.C. §§ 405(g), 1383(g); *Hartranft v. Apfel*, 181 F.3d at 360. Substantial evidence

is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Id.* (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). It is "more

than a mere scintilla but may be somewhat less than a preponderance of the evidence."

*Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971) (internal citation omitted).

The standard of substantial evidence includes deference to inferences drawn from the

facts that are supported by substantial evidence. *Shaudeck v. Comm'r*, 181 F.3d 429, 431

(3d Cir. 1999). A decision by the Commissioner that is supported by substantial evidence

will be upheld, even we might have reached a different conclusion from the facts.

*Hartranft*, 181 F.3d at 360.

## II.

2

In order to establish a disability under the Social Security Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988) and 42 U.S.C. § 423(d)(1)). The claimant is prevented from engaging in any substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at 427-28 (quoting 42 U.S.C. § 423(d)(2)(A)).

A disability claim is evaluated pursuant to the five-step procedure set forth by the Social Security Administration in 20 C.F.R. §§ 404.1520 and 416.920. *See Plummer*, 186 F.3d at 428. First, the Commissioner must determine if the claimant is currently engaging in substantial gainful activity. If so, the claim will be denied. *Plummer*, 186 F.3d at 428. Second, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to make this showing, her claim will be denied. *Id.* Third, the Commissioner looks at the impairments listed in 20 C.F.R. § 404.1520(d) and determines whether the claimant's medical evidence demonstrates one of these impairments or its equivalent. *Id.* If the determination is in the negative, the analysis proceeds to steps four and five. Fourth, the Commissioner must consider whether the

3

claimant possesses the residual functional capacity to perform her past relevant work. *Id.* (citing 20 C.F.R. § 404.1520(d)). The claimant has the burden of establishing her inability to return to her past relevant work. *Id.* Step Four includes the following three substeps: (I) "the ALJ must make specific findings of fact as to the claimant's residual functional capacity"; (ii) "the ALJ must make findings of the physical and mental demands of the claimant's past relevant work"; and (iii) "the ALJ must compare the residual functional capacity to perform past relevant work to determine whether the claimant has the level of capability needed to perform the past relevant work." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000). If the claimant meets her burden, the burden then shifts to the Commissioner for the fifth and final step. In this fifth step, the Commissioner must demonstrate that the claimant is able to perform other available work; otherwise the claim of disability must be granted. *Id.* (citing 20 C.F.R. § 404.1520(f)).

### III.

Dr. E.V. Medrano saw Jenkins in 1992 and 1993 for neck pain. Tr. 112-13. He completed a report on July 15, 2000, which noted that Jenkins' neurological examination was normal. *Id.* Her extremities also were normal. *Id.* Dr. F. Brand also saw Jenkins for neck pain, in 1999. Tr. 120. Dr. Brand diagnosed Jenkins' pain as cervical radiculopathy and degenerative disc disease. Tr. 121. He prescribed Indocin, cold compress, and physical therapy. *Id.* We do not have any assessment by Dr. Brand concerning Jenkins'

4

response to treatment. Jenkins also had an MRI scan of her cervical spine in October, 1999, which showed a bulging disc with dessication at the C3-4 and C4-5 disc. Tr. 131. This medical information predates the relevant period.

The period relevant to our analysis is from March 24, 2000 to June 28, 2002. On June 18, 2001, Jenkins' MRI of her lumbosacral spine was normal, as were x-rays of her chest, left shoulder, and lumbosacral spine. Tr. 177, 140.

On June 20, 2001, Jenkins was examined by Dr. Kenneth W. Mahan at the Commissioner's request. Jenkins reported that she had suffered an injury to her left shoulder and left side while moving furniture in 1993. Tr. 149. X-rays at the time had shown no fracture or dislocation. *Id.* Despite seeing a chiropractor and physician, she continued to have pain in her left shoulder and on her left side. *Id.* Dr. Mahan's report states that Dr. Meheta prescribed physical therapy, skeletal muscle relaxants, and painkillers in 1993. *Id.* Jenkins still had a recurrent left parascapular pain. *Id.*

Dr. Mahan noted that Jenkins was 5'4" and 213 pounds. Tr. 150. She could dress and undress without difficulty. The physician observed a left parascapular pain with radiculopathy into her left shoulder and down her left arm and left latissimus dorsi muscle range. *Id.* He also observed moderate paraspinal muscle spasms bilaterally and loss of lumbar lordosis. *Id.* No radicular pain was carried into the lumbosacral and to the sacral parts, nor was there marked tenderness in the lumbosacral joints. *Id.* Jenkins had straight leg raising of 70 degrees bilaterally and her forward flexion of her spine was 60 degrees.

5

*Id.* Jenkins was able to tiptoe, heel walk, squat, kneel, and bend. *Id.* Her shoulder motions were normal, as were the dorsiflexion and palmar flexion of the wrists, elbow, and hands. *Id.*

Dr. Mahan diagnosed Jenkins with chronic lumbar strain, trigger point myofascitis of the left parascapular region and the left shoulder-arm syndrome. *Id.* He noted that her MRIs and all radiographs were negative. *Id.* He found no sensory changes in her upper extremities involving the radial, ulnar, axillary, or median nerve. *Id.* Dr. Mahan determined her status was post jerk injury or over stretch injury, hyperextension injury of the left shoulder and the left trunk involving the latissimus dorsi muscle group. *Id.*

On July 5, 2001, State agency physician Dr. Raymond Briski reviewed Jenkins' medical evidence and found that she did not have a severe functional orthopedic impairment. Tr. 134.

A physical therapy report of August of 2001 indicates Jenkins reported that she had injured herself in 1993, but that the pain had become worse in the past three weeks. Tr. 179. The report also relays that Jenkins had attended school from 9 a.m. to 5 p.m. each day for the past three weeks. Tr. 180. The report indicates that Jenkins had had trouble with stairs in the past three weeks and the pain in her left hip and side had worsened. *Id.* The report states that Jenkins reported being unable to walk far distances on some days and that she could not do a lot of housework because it caused too much pain afterwards. *Id.* Also noted on the report were asthma, anemia, and obesity, and the

medications that were being used to treat those conditions. *Id.* On August 18, 2001, Jenkins had a chest x-ray that was normal and an x-ray of her lumbar spine revealing mild narrowing of the L5-S1 space, but no fracture or listhisis. Tr. 178.

Jenkins attended three sessions of physical therapy, but she was dismissed from further sessions after twice failing to attend. Tr. 173. However, she had experienced some improvement in her previous visits. Tr. 174.

At the hearing, Dr. Albert G. Mylod, an orthopedic surgeon, testified after reviewing Jenkins' medical records. He reiterated that the x-rays all were normal and most of the other evidence was normal, although he did state that a Dr. Brant had said one x-ray showed degenerative disc disease at C6-7. Tr. 44, 49. He stated that because the MRI was not entirely readable, "[w]e know the cervical is not normal, we just don't know to what extent it is because we can't read it all." Tr. 49. The MRI of the lumbar spine was normal. Tr. 49.

## V.

The ALJ concluded that Jenkins had not suffered from a disability under the Social Security Act at any time through the date of his decision. Following the five-step analysis required, the ALJ first found that Jenkins had not engaged in substantial gainful activity since her alleged onset date of March 24, 2000. Second, he determined that Jenkins has a severe orthopedic condition relating back to her 1993 injury. The ALJ then examined Jenkins' impairments. He found that an October 15, 1999 MRI of her cervical spine

7

revealed anterior bulging of the C5-C6 disc and dessication of the C3-C4 and C4-C5 discs, and a left internal component of a herniated C4-C5 disc, with left nerve compression. He found that Jenkins had had chiropractic treatment from July 26, 1999 through December 1, 1999, but remained symptomatic. X-rays taken on June 19, 2000 of Jenkins' chest, left shoulder, and lumbosacral spine were normal.

The ALJ found that Dr. Medrano, Jenkins' treating physician since March 3, 1992, indicated in a July 15, 2000 report that Jenkins had infrequent visits and that she suffered from URI, neck pain, and low back pain from 1993. He had seen Jenkins last on February 6, 1993. A subsequent treating physician, Dr. Brunt, indicated in a July 11, 2000 report that he had last seen Jenkins on June 1, 1999 and that she had a six-year history of neck pain radiating to her arms. He observed neck pain, spasm of the scapualae, and, from the x-ray images, degenerative disc disease at the C6-C7 level. He diagnosed cervical radiculopathy and degenerative disc disease. He noted Jenkins had undergone physical therapy and taken cold compresses and Indocin, but that the results were unknown.

As noted above, the ALJ noted that the MRI performed on June 18, 2001 on Jenkins' lumbosacral spine was normal, although Jenkins continued to have pain. The ALJ recounted that based on his consultative evaluation on June 20, 2001, Jenkins reported to Dr. Mahan, the state agency physician, that she had sustained a jerk injury to her left shoulder and side while moving heavy furniture in 1993. She also reported

8

having developed a "stinger" in her left shoulder and neck, and that her x-rays at the time of the injury were normal. Chiropractic treatment had not been successful, and she continued to have pain on her left side. The ALJ restated Dr. Mahan's conclusions, which we have recited above.

The ALJ also noted that the Mckenzie Institute Lumbar Spine Assessment form, dated August 23, 2001, indicated that Jenkins had been laid off from her job as a desk clerk in 1999, that her symptoms included left hip pain, particularly when climbing stairs, and that she had had pain in her left side since 1993. It also noted that Jenkins suffered from asthma, hypertension, anemia, and obesity.

To complete the third step, the ALJ evaluated the severity of Jenkins' "orthopedic condition or impairments" under the Listing of Impairments in Appendix 1, Subpart P, Regulations No. 4, section 1.00, however, he determined that the record did not merit a finding at this level.

In undertaking the fourth step, the ALJ examined whether Jenkins had the residual functional capacity to perform her past relevant work. The ALJ concluded that, although Jenkins had worked until September 30, 1999, when the Army base where she was working closed, she did not seek work thereafter once the base closed. However, she continued to live with her ten-year-old son without receiving help from anyone to assist in maintaining the household. Moreover, the ALJ was skeptical about Jenkins' subjective complaints. The ALJ concluded that Jenkins did not stop working because of her

9

orthopedic injuries or pain. Rather, the ALJ concluded that she stopped because her job no longer existed. That is consistent with the fact that, although she returned to work as a hotel clerk only one month after her 1993 injury, she did not file her disability claim or seek treatment for her left shoulder until immediately after she was laid off.

In evaluating the extent to which Jenkins' shoulder condition prevents her from working, the ALJ considered an October 15, 1999 MRI that showed a problem with Jenkins' cervical spine, and the fact that chiropractic treatment had not been very successful. However, the ALJ also pointed to the normal x-rays of the left shoulder, lumbosacral spine, and chest of June 20, 2001. He also noted that Jenkins' infrequent visits to Dr. Medrano were consistent with her ability to work during that time, and her visits to Dr. Brunt occurred after the base closed. The ALJ also discussed Dr. Mahan's findings.

The ALJ concluded that Jenkins probably would still be working as a hotel desk clerk if the base had not closed. Nothing in the record indicated that she could not lift weight that did not exceed 20 pounds, or that perform other activity expected of a hotel clerk such as frequent reaching and pushing or pulling using the left upper extremities. Accordingly, the ALJ determined that Jenkins had the residual functional capacity to perform her past relevant work as a hotel desk clerk, and that she was not disabled.

**VI.**

As stated above, we must determine whether substantial evidence supports the

10

decision of the ALJ.   Thus, we must decide whether the record as a whole would allow a reasonable fact finder to accept the conclusions reached by the Commissioner.

In arguing against the ALJ's conclusion, Jenkins first claims that she suffers from twelve severe impairments, and that the ALJ did not clarify which he found severe at step two of his inquiry.  However, nine of these impairments are subsumed into the ALJ's determination that Jenkins suffered from a severe orthopedic condition relating to her 1993 injury.  Moreover, in making that determination, the ALJ did specifically mention the nine impairments.  The fact that a severity determination was not made as to each of the nine impairments comprising the ultimate determination that Jenkins had a severe orthopedic condition is not significant. *See* 20 C.F.R. §§ 404.1520©), 416.920©).  Nor is it significant that the ALJ failed to link restrictions with impairments.

Jenkins argues that the ALJ erred in not explaining why the three impairments that were clearly not part of the severe orthopedic condition – asthma, anemia, and obesity – were not severe.  However, an impairment is not severe if it does not significantly limit the claimant's physical ability to do basic work activities, including walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling.   20 C.F.R. §§ 404.1520(c), 404.1521(a); *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).  It was Jenkins' burden to establish that any impairment results in work-related limitations.  She failed to do so with regard to her claims of asthma, anemia, or obesity.

Next, Jenkins argues that the ALJ's determination violates our directive in *Burnett*

11

*v. Commissioner of Social Security*, 220 F.3d 112 (3d Cir. 2000). There, we found the ALJ's step three determination was nothing more than a bare conclusion and thus could not be meaningfully reviewed. 220 F.3d at 119. We directed the ALJ there to fully develop the record and explain his step three findings, including an analysis of why the claimant's impairments were not equivalent in severity to those listed. *Id.* at 120.

Here, however, the ALJ specifically indicated that he had considered section 1.00, which pertains to all impairments related to the musculoskeletal system. 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00. The MRI and radiographs of the relevant areas were negative. Additionally, Jenkins had to show that she was unable to perform fine and gross movements effectively. *Id.*

Section 1.04 relates to disorders of the spine resulting in compromise of a nerve root or the spinal cord. 20 C.F.R. Part 404, Subpart P, App. 1, § 1.04. For the reasons explained by the ALJ, Jenkins simply does not meet all the criteria listed in section 1.04. The ALJ properly found that "[t]here were no significant findings with respect to the lumbosacral area or neurological deficits." Tr. 16. Jenkins had no sensory changes in the upper extremities and could perform her straight leg raising test to 70 degrees. She could tiptoe, heel walk, squat, kneel, and bend without apparent difficulty and had normal reflexes in the upper extremities with full grip strength.

Accordingly substantial evidence supports the ALJ's determination that Jenkins' impairments did not match any of those listed. Although the ALJ did not specifically

12

state which subsections he considered in making his determination, his findings are sufficiently explained to allow meaningful judicial review, and that is what *Burnett* requires. 220 F.3d at 119.

Jenkins next argues that the ALJ improperly found she could perform her past relevant work. We have already mentioned the three substeps that are relevant to an inquiry at step four. *See Burnett*, 220 F.3d at 120. "Residual functional capacity" is what the claimant is "still able to do despite the limitations caused by his or her impairment(s)." *Id.* at 121 (quoting *Apfel*, 181 F.3d at 359 n.1).

The ALJ determined that Jenkins' only limitations were in lifting or carrying more than 20 pounds and frequent reaching and pushing or pulling involving the left upper extremity. He also found that Jenkins' past relevant work as a hotel desk clerk did not require her to perform any work-related activities that were precluded by these limitations. These findings are supported by substantial evidence, specifically, the opinions of Drs. Mahan and Briski, as well as Dr. Mylod, as discussed above. Furthermore, in Jenkins' initial application for benefits, she indicated that her hotel desk clerk job had entailed walking, standing, and sitting for four hours each, and lifting less than ten pounds. Tr. 76. The *Dictionary of Occupational Titles* identifies the job of hotel clerk as light work, which involves lifting no more than twenty pounds at a time, with frequent lifting or carrying of objects weighing up to ten pounds. *Dictionary of Occupational Titles*, I. Code Nos. 238.367-038, Vol. 1, p.209 (4th ed. Rev. 1991).

13

As stated above, it is the claimant's burden to establish that she is unable to return to her past relevant work. *Plummer*, 186 F.3d at 428. On this record, it was reasonable for the ALJ to conclude that Jenkins could perform the requirements of her past relevant work. Moreover, the ALJ doubted the veracity of Jenkins' subjective complaints. It was Jenkins' burden to demonstrate by medical indications or findings that an underlying condition existed, which would reasonably be expected to produce the symptoms complained of. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1529(b), 416.929(b). If the symptoms suggest a greater functional restriction than is demonstrated by the objective evidence alone, the Commissioner considers evidence such as the claimant's statements, daily activities, duration and frequency of pain, medication, and treatment. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The Commissioner has discretion to evaluate the credibility of the claimant's complaints and draw a conclusion based upon medical findings and other available information.

The ALJ's rejection of Jenkins' subjective complaints is consistent with the medical evidence in this record.

## V.

Accordingly, for all the reasons set forth above, the order of the District Court affirming the ALJ's rejection of Jenkins' claim will be affirmed.